**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARLIN WASSERMAN, derivatively on behalf of LULULEMON ATHLETICA INC., <br><br> Plaintiff, <br><br> v. <br><br> CALVIN MCDONALD, MICHAEL CASEY, STEPHANIE FERRIS, MEGHAN FRANK, KOURTNEY GIBSON, TRICIA GLYNN, SHANE GRANT, KATHRYN HENRY, TERI LIST, ALISON LOEHNIS, ISABEL MAHE, JON MCNEIL, MARTHA MORFITT, GLENN MURPHY, DAVID MUSSAFER, and EMILY WHITE, <br><br> Defendants, <br><br> and <br><br> LULULEMON ATHLETICA INC., <br><br> Nominal Defendant. | Case No.: <br><br> **Jury Trial Demanded** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Arlin Wasserman ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Lululemon Athletica Inc. ("Lululemon" or the "Company"), submits this Verified Stockholder Derivative Complaint against Defendants and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by Lululemon with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Lululemon; (iii) court submissions in a securities class action against the Company's chief executive officer ("CEO") and chief financial officer ("CFO") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading between October 28, 2020 and July 24, 2024 (the "Relevant Period") with respect to Lululemon's business, operations, and prospects (the "Securities Class Action"); and (iv) other publicly available information concerning Lululemon.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserted on behalf of Nominal Defendant Lululemon against certain current and former officers and members of the Company's Board of Directors (the "Board") for the claims asserted herein to recover damages caused to the Company.

2.      Lululemon is a Canadian athletic apparel company specializing in premium activewear for men and women.  Founded in 1998 by Chip Wilson in Vancouver as a combined design and yoga studio, the Company has since grown into a major global brand in the activewear market, with over 500 retail locations across North America, Europe, Asia, and Oceania.

1

3.      In October 2020, Lululemon announced a new corporate initiative called the "Impact Agenda," which included a diversity-focused component titled "Inclusion, Diversity, Equity, and Action" ("IDEA"). The stated objective of IDEA was to: "Reflect the diversity of the communities the Company serves and operates in around the world by 2025."

4.      Throughout the Relevant Period, the Individual Defendants failed to disclose two critical facts: first, the IDEA program was not effectively structured to address discrimination within Lululemon, and second, discrimination against employees continued to occur despite the IDEA program's implementation.

5.      The inadequacies of the IDEA program came to light on November 20, 2023, when the leading digital authority in the fashion business, *The Business of Fashion* ("BoF"), published an exposé titled "At lululemon, Being Black is 'Off-Brand'" (the "BoF Article"). The BoF Article featured accounts from fourteen former Lululemon employees who consistently described "a corporate culture that is unwelcoming of Black people." The article criticized IDEA as "protecting the Company's image" and claimed this focus actually "reduc[ed] its effectiveness and in many ways exacerbat[ed] underlying issues."

6.      Beyond the IDEA program's issues, the Individual Defendants also concealed significant problems with the Company's inventory allocation methods throughout the Relevant Period.

7.      Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects related to IDEA. Specifically, the Individual Defendants failed to disclose to investors (i) continued discrimination at Lululemon despite the implementation of the IDEA program; and (ii) the issues with the Company's inventory allocation.

8.      Lululemon reports its revenue across three geographic segments: The Americas, China Mainland, and Rest of World.  The Americas segment, primarily comprising the U.S. and Canada, consistently generates the majority of Company revenue.  Specifically, the U.S. women's products segment is the most lucrative for the Company, and therefore Lululemon relied heavily on U.S. women's products for revenue.

9.      To support its growth, the Company needed to ensure that its inventory matched customer demand.  In January 2023, Lululemon acknowledged it needed to reduce its overall inventory level after carrying more inventory than expected for the fiscal year 2022 and align its inventory with expected demand going forward.

10.     When Lululemon presented its third quarter 2023 results in December 2023, the Individual Defendants falsely claimed that inventory was adequate and that Lululemon was gaining market share among younger U.S. women in response to a back-to-school marketing campaign Lululemon ran in the summer of 2023.  In reality, Lululemon lacked enough inventory in sizes 0 to 4 across a variety of colors to meet the increased demand.  This inventory allocation failure led to slower U.S. growth and unsustainable market share gains.

11.     On March 21, 2024, after admitting the inventory allocation failure, Lululemon continued to mislead investors by claiming that the situation would improve in the next quarter. In May 2024, the company announced leadership changes, further signaling that there was no quick fix. The stock dropped again as a result.

12.     On March 21, 2024, after market closed, Lululemon issued a press release announcing financial results for the fourth quarter and full-year 2023, revealing slowing growth in The Americas region.  (Press Release, Lululemon Athletica Inc., *Lululemon Athletica Inc. Announces Fourth Quarter and Full Year Fiscal 2023 Results* (Mar. 21, 2024) (the "March 21,

2024 Press Release")).  The Individual Defendants were forced to admit to the inventory allocation failure because of the dramatic slowdown in U.S. growth as a result of the Company lacking sufficient inventory of sizes 0 to 4 and color in U.S. women's products to meet the expected demand from the Company's marketing efforts.

13.     This news caused Lululemon's stock price to fall $75.65 per share, over 15%, from $478.84 to $403.19 in a single trading day between March 21 and March 22, 2024.

14.     Then, the Individual Defendants continued to mislead investors by claiming that a new legging product, the Breezethrough legging, would drive significant U.S. growth and prevent the inventory allocation failure from further affecting the Company's performance for fiscal year 2024.

15.     Lululemon launched its Breezethrough leggings on July 9, 2024.  However, the launch faced immediate customer backlash over unflattering designs, forcing the Company to pause sales within weeks, on July 24, 2024.  On July 25, 2024, when *Bloomberg* reported that a Lululemon spokesperson had confirmed that the Company "made the decision to pause on sales [of the Breezethrough leggings] for now to make any adjustments necessary to deliver the best possible product experience," it was revealed that the product was a "test and learn" situation rather than a product launch and so was never capable of contributing to the Company's revenue or profit for fiscal year 2024.

16.     This revelation caused Lululemon's stock to drop an additional $24.74, or 9.09%, from $272.06 to $247.32 per share on July 25, 2024.

17.     On July 26, 2024, JPMorgan lowered its price target for Lululemon stock from $457 to $338, citing concerns about product execution issues compounded by existing problems with color palette and inventory management.

18.     With respect to the inventory issues, during the Relevant Period, the Individual Defendants made materially false and/or misleading statements, and failed to disclose to investors that: (1) the Company was struggling with inventory allocation issues and color palette execution issues; (2) the Company's Breezethrough leggings introduction was not a product launch and so could not have remedied the U.S. growth issue caused by the inventory allocation failure ; (3) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

19.     Further, during the Relevant Period, the Individual Defendants authorized a share repurchase program causing Lululemon to repurchase billions of dollars of its common stock at artificially inflated prices.  As a result, the Company ultimately overpaid for its own stock by more than $700 million.

20.     Finally, throughout the Relevant Period while the price of Lululemon stock was artificially inflated, key executives, including Defendants Calvin McDonald ("McDonald") and Meghan Frank ("Frank"), sold significant shares of Lululemon stock for significant profit.

21.     As a direct and proximate result of the misconduct described herein by Individual Defendants, Lululemon has sustained significant damages as explained below.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 20(a) of the Securities Exchange, as well as Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Lululemon.  Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant Lululemon could have sued the same Defendants in this District.

## PARTIES

25.     Plaintiff is a Lululemon stockholder and has continuously held Lululemon stock from the time of the wrongdoing alleged herein until the present.  Plaintiff will fairly and adequately represent Lululemon's interest in this action.

26.     Nominal Defendant Lululemon is incorporated under the laws of Delaware, and its principal executive offices are located at 1818 Cornwall Avenue, Vancouver, British Columbia, Canada V6J 1C7.  Lululemon's common stock trades on the Nasdaq exchange under the symbol "LULU."

27.     Defendant McDonald has served as the Company's CEO and member of the Board since August 2018.  In 2023, McDonald received $16,494,777 in total compensation.  McDonald is a named defendant in the Securities Class Action.

28.     Defendant Frank has served as CFO since November 2020.  Prior to that time, beginning in 2016, Frank served as the Senior Vice President, Financial Planning and Analysis, and served as interim Co-CFO from April 2020 until her appointment as CFO.  In 2023 and 2022,

Frank received $4,091,722 and $3,487,838, respectively, in total compensation. Frank is a named defendant in the Securities Class Action.

29.     Defendant Michael Casey ("Casey") has served as a member of the Board since October 2007. He has served as a member of the Audit Committee since 2007, serving as its Chair from 2007 to 2011 and from 2022 to present. He is also a member of the People, Culture, and Compensation Committee. In 2023, Casey received $297,924 in total compensation.

30.     Defendant Stephanie Ferris ("Ferris") served as a member of the Board from July 2019 to 2022. She served as a member of the Audit Committee from July 2019 until 2022.

31.     Defendant Kourtney Gibson ("Gibson") served as a member of the Board from November 18, 2020 until June 2023. She served as a member of the Audit Committee from 2020 until June 2023.

32.     Defendant Tricia Glynn ("Glynn") served as a member of the Board from 2017 to 2021. She served as a member of the Nominating and Corporate Governance Committee from 2017 through 2021.

33.     Defendant Shane Grant ("Grant") has served as a member of the Board and Audit Committee since November 2023. In 2023, Grant received $49,647 in total compensation.

34.     Defendant Kathryn Henry ("Henry") has served as a member of the Board since January 2016 and as a member of the Audit Committee since 2017 and the People, Culture, and Compensation Committee since 2018. Henry previously served as Chief Information Officer, Logistics and Distribution at Lululemon from 2010 to 2014, overseeing all global information and technology operations for the Company. In 2023, Henry received $269,590 in total compensation.

35.     Defendant Teri List ("List") has served as a member of the Board and the Audit Committee since March 2024.

36.     Defendant Alison Loehnis ("Loehnis") has served as a member of the Board since January 25, 2022 and as a member of the Audit Committee since 2022.  In 2023, Loehnis received $257,090 in total compensation.

37.     Defendant Isabel Mahe ("Mahe") has served as a member of the Board since November 3, 2022.  Mahe is a member of the Corporate Responsibility, Sustainability, and Governance Committee.  In 2023, Mahe received $272,773 in total compensation.

38.     Defendant Jon McNeil ("McNeil") has served as a member of the Board since April 2016.  He is a member of the Corporate Responsibility, Sustainability, and Governance Committee.  In 2023, McNeil received $254,090 in total compensation.

39.     Defendant Martha Morfitt ("Morfitt") has served as a member of the Board since December 2008, serving as its Chair since March 2022.  She has served as a member of the Audit Committee since March 2009, serving as its Chair from 2012 until 2021.  In 2023, Morfitt received $417,090 in total compensation.

40.     Defendant Glenn Murphy ("Murphy") served as co-Chair of the Board from April 2017 to August 2023.

41.     Defendant David Mussafer ("Mussafer") has served as a member of the Board since September 2014.  He is the chair of the Corporate Responsibility, Sustainability, and Governance Committee.  In 2023, Mussafer received $320,424 in total compensation.

42.     Defendant Emily White ("White") has served as a member of the Board since November 2011.  She is chair of the People, Culture, and Compensation Committee and a member of the Corporate Responsibility, Sustainability, and Governance Committee.  In 2023, White received $290,840 in total compensation.

43.     The following Defendants are collectively referenced herein as the "Individual Defendants:" Casey, Ferris, Frank, Gibson, Glynn, Grant, Henry, List, Loehnis, Mahe, McDonald, McNeil, Morfitt, Murphy, Mussafer, and White.

44.     The following Individual Defendants are collectively referenced herein as the "Director Defendants:" Casey, Glynn, Grant, Henry, List, Loehnis, Mahe, McDonald, McNeil, Morfitt, Murphy, Mussafer, and White.

45.     The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants:" Frank, Henry, and McDonald.

46.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants:" Casey, Grant, Henry, List, Loehnis, and Morfitt.

47.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants:" Frank and McDonald.

48.     The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

49.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Lululemon.

50.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

51.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

52.     Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

53.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

54.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Lululemon were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about

the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

55.    The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

56.    Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lululemon.

57.    The Lululemon Board has adopted Lululemon's Global Code of Business Conduct and Ethics (the "Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants, including the following:

**01. We comply with all laws, and in doing so we contribute to healthy communities.**

We are all expected to comply with the law. This includes not only following the laws of our home market, but also complying with local laws when visiting different markets or transacting business with individuals, organizations, or guests

located in a different market.  Be particularly aware of the following key laws that have an impact on our business:

*        *        *

**Insider Trading Laws**

We may not buy or sell shares of lululemon stock (or securities of other companies) if we know of material information that has not been made public.  Material information is any information that would influence a reasonable investor's decision to buy or sell stock.  Examples of "material information" include consolidated sales figures, the departure of an executive, or a significant issue with a key supplier.  Trading in shares while in possession of non-public material information is a serious violation of securities law as is providing non-public material information to someone who may trade in our shares.  Never provide material non-public information to other people, including family members or friends as it may enable them to improperly buy or sell securities using confidential information.  Please refer to our Insider Trading Policy for more information. Members of our board of directors, executive officers, and certain other employees have additional restrictions on trading in lululemon securities, which are outlined in our Insider Trading Policy.

*        *        *

**03. We are all responsible for fostering a respectful and inclusive workplace[.]**

**We stand for humanity, diversity, and empathy.**  We strive to provide an environment that creates the conditions for all employees to excel, be creative, take initiatives, feel a sense of belonging, and seize opportunities.  Teamwork and collaboration help us to leverage our diverse backgrounds, talents, and ideas for innovative and fresh solutions.  Our commitment to inclusive behaviour and ethical conduct, aligned with our values of inclusion and personal responsibility, govern how we interact with guests, vendors, colleagues, and members of the public at all times.

*        *        *

**We do not tolerate racism, discrimination, harassment or hate.**  The diversity of our workforce is a critical asset that helps us achieve our goals.  We are committed to providing equal opportunity in all aspects of employment and will not tolerate discrimination on the basis of race, color, creed, age, sex, sexual orientation, gender identity or gender expression, national origin, religion, body size, family status, marital status, medical condition, physical or mental disability, military service, pregnancy, childbirth and related medical conditions, or any other legally protected status.  We will not tolerate harassment or unlawful behaviours of any kind, including derogatory comments or conduct based on sexual orientation, race, ethnicity, or any other protected status.

\*      \*      \*

**05. Personal responsibility is the path to success.**

**Protecting lululemon's Assets**

We all have a responsibility to protect lululemon's assets from improper use or disclosure. This includes, among other things, protecting all non-public information from disclosure, including our trade secrets, design information, information about our suppliers, contracts, and manufacturing processes, guest information, financial information and employee and pricing data, as well as not reproducing licensed or internally developed software for personal use. We also don't permit unauthorized photography or video recording of any nature in our stores, the SSC, the DCs or any other lululemon property.

\*      \*      \*

**Accurate Records**

We must follow our system of internal controls and disclosure controls and ensure that corporate records and all securities filings are timely, legitimate, and accurate. Creating false or misleading records is prohibited, and all financial accounts, reports, and records are expected to be fair, accurate, and appropriately authorized.

**Document Retention**

We are expected to comply with all records management policies and legal hold notices. These policies apply to retention and destruction of all records created by lululemon, including, but not limited to, hard copies, electronic files, emails, instant messages, video, and backup tapes.

\*      \*      \*

**06. Questions, concerns and assisting with investigations.**

\*      \*      \*

**Waivers**

Waivers or exceptions to the Code for any employee will be granted only in advance and under exceptional circumstances by the Legal department. A waiver of the Code for any executive officer or member of our board of directors may be made only by the board of directors or a designated committee of the board.

58.     The Lululemon Board has also adopted Corporate Governance Guidelines (the "Governance Guidelines") to deter wrongdoing.  The Governance Guidelines impose additional duties and responsibilities on the Individual Defendants.

59.     The Governance Guidelines defines the role of the Board as follows:

**Role of Board and Management**

The Board of Directors (the "Board"), which is elected by the stockholders, is the ultimate decision-making body of lululemon athletica inc. (the "Company") except with respect to those matters reserved to the stockholders.  The Board selects the senior management team, which is charged with the day-to-day conduct of the Company's business.  Having selected the senior management team, the Board acts as an advisor and counselor to senior management and ultimately monitors its performance.

The fundamental role of the members of the Board is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders.  In fulfilling that responsibility, the directors may reasonably rely on the honesty and integrity of the Company's senior management and expert legal, accounting, financial and other advisors.

Directors are expected to attend Board and applicable committee meetings, absent extraordinary circumstances, and to review meeting materials in advance of such meetings.  Directors are encouraged to attend the Company's annual meetings of stockholders.

60.     The Governance Guidelines discusses the Board's role in risk oversight as follows:

**Risk Oversight**

In its governance role, and particularly in exercising its duty of care and diligence, the Board is responsible for ensuring that appropriate risk management policies and procedures are in place to protect the Company's assets and business.  While the Board has the ultimate oversight responsibility for the risk management process, the Board has delegated to the Audit Committee the initial responsibility of overseeing the Company's risk assessment and risk management.  In fulfilling its delegated responsibility, the Audit Committee requires management to ensure that an approach to risk management is implemented as a part of the day-to-day operations of the Company, and to design internal control systems with a view to identifying and managing material risks.  On a periodic basis (not less than quarterly), the Audit Committee reviews and discusses with the Company's Chief Executive Officer, its Risk and Advisory team and its Finance team the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks.  In addition, the Audit Committee evaluates

the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management, including discussing with management material risk exposures and the steps being taken to monitor, control and report such risks. The Audit Committee reports its activities to the full Board on a regular basis (not less than annually) and is responsible for making such recommendations with respect to risk assessment and management as it may deem necessary or appropriate. On a periodic basis (not less than annually), the PCC Committee reviews the various design elements of the Company's compensation policies and practices to determine whether any of their aspects encourage excessive or inappropriate risk-taking by the Company's executive officers. The PCC Committee reports its activities in this regard to the full Board and makes such recommendations to the Board with respect to the Company's compensation policies and practices as it may deem necessary or appropriate.

The Board oversees environmental, social and governance ("ESG") management at the Company and has delegated responsibility to both the Audit Committee and the CRSG Committee. The Board and its committees assess whether management has appropriate mechanisms to oversee the development of ESG initiatives, strategies, policies, and practices related to matters of sustainability and corporate responsibility that may have a material impact on the Company. As part of this function, the Board and its committees review and discuss reports submitted by management with respect to the Company's current goals and metrics, as well as significant events, issues and risks that may affect the Company's business or financial performance.

61.     The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Casey, Grant, Henry, List, Loehnis, and Morfitt during the Relevant Period.

62.     Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the following:

**PURPOSE**

. . . The primary purpose of the Committee is to assist the Board of Directors in undertaking and fulfilling its oversight responsibilities in connection with:

- reviewing the financial reports and other financial information prepared by the Company for submission to any governmental or regulatory body or the public and monitoring the integrity of such financial reports;

- reviewing the Company's systems of internal controls established for finance, accounting, legal compliance and ethics;

- reviewing the Company's accounting and financial reporting processes generally and the audits of the financial statements of the Company;

- reviewing the Company's Global Risk & Advisory Services function;

- monitoring compliance with legal and regulatory requirements and overseeing the Company's corporate compliance program;

*     *     *

- overseeing the Company's financial risk assessment and risk management policies, procedures and practices;

- overseeing the Company's enterprise risk assessment and management policies, procedures and practices (including regarding those risks related to information security, cyber security and data protection); . . .

*     *     *

**DUTIES AND RESPONSIBILITIES**

In furtherance of the Committee's responsibilities, the Committee's policies and procedures will remain flexible to best react to changing conditions and to ensure to the Board of Directors and stockholders that the corporate accounting and reporting practices of the Company are in accordance with applicable requirements and standards. Thus, the following functions are a guide with the understanding that the Committee may diverge from this guide as appropriate given the circumstances.

**Review of Financial Reports and Press Releases**

- The Committee shall review and discuss with management and the independent public accountants the audited financial statements and related footnotes to be included in the Company's Annual Report on Form 10-K (or the Annual Report to Stockholders if distributed prior to the filing of Form 10-K) prior to the filing of the Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") and review and discuss with the independent public accountants the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board (PCAOB) and the SEC, and if applicable, the Canadian securities regulatory authorities. The Committee shall recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

- The Committee shall review with management and the independent public accountants interim financial results to be included in the Company's

16

quarterly reports on Form 10-Q to be filed with the SEC and, if applicable, the Canadian securities regulatory authorities, MD&A and the matters required to be discussed by the applicable requirements of the PCAOB and the SEC prior to the Company's filing of any Form 10-Q.

- The Committee shall review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer, or the Company's disclosure committee or any member thereof, during their certification process for the Form 10-K or Form 10-Q and for the certifications, if applicable, required to be filed with the Canadian securities regulatory authorities, as appropriate. In addition, the Committee shall discuss with the Company's management and independent public accountants whether the Company's quarterly financial statements as well as significant events, transactions and changes in accounting estimates were considered by the independent public accountants (after performing their required quarterly review) to have affected the quality of the Company's financial reporting. Such reviews will occur prior to the Company's filing of the Form 10-K, Form 10-Q and, to the extent practicable, prior to the quarterly earnings release. The Committee shall review the Company's earnings press releases, including the use of "pro-forma" or "adjusted" non-GAAP information (subject to compliance with law and applicable SEC rules, including Regulation G), as well as other publicly disclosed financial information and earnings guidance, prior to the issuance of any earnings press release, and discuss any of the foregoing with management to the extent desired by any member of the Committee. Such discussion may be general in nature (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

*       *       *

**Financial Reporting, Accounting Principles and Internal Control Matters**

- The Committee shall advise management and the independent public accountants that they are expected to provide the Committee with a timely analysis of significant financial reporting, accounting, or internal control matters.

- The Committee shall review with the Company's management and the independent public accountants their judgments about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity and transparency of the disclosures in the financial statements.

- The Committee shall make or cause to be made, from time to time, such other examinations or reviews as the Committee may deem advisable with respect to the adequacy of the systems of internal controls and accounting practices of the Company and its subsidiaries and with respect to current

accounting trends and developments, and take such action with respect thereto as may be deemed appropriate.

- The Committee shall adopt and maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- The Committee may take all other appropriate action, including notifying the SEC, and, if applicable, the Canadian securities regulatory authorities, if the Company fails in any material respect to implement an appropriate response that the Committee has recommended for adoption by the Company.

*      *      *

**Risk Oversight**

- The Committee shall review the status of compliance with laws, regulations, and internal procedures, contingent liabilities and risks that may be material to the Company, the scope and status of systems designed to assure the Company's compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and other third parties as determined by the Committee on such matters, as well as major legislative and regulatory developments, including pronouncements by the Financial Accounting Standards Board, the SEC, the Canadian securities regulatory authorities and other agencies or bodies, on the Company's financial statements.

- The Committee shall meet periodically, but no less than quarterly, with management, the Company's Global Risk & Advisory Services team and the Company's independent public accountants to review and discuss the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks.

- The Committee shall regularly evaluate the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security and data protection).

- The Committee shall review and monitor the Company's cybersecurity and information security policies and procedures regarding cybersecurity and information security, and shall regularly report to the Board of Directors at such intervals as determined by the Committee the substance of those reviews and, as necessary, recommend to the Board of Directors such actions as the Committee determines necessary or advisable.

- The Committee shall report its risk oversight activities to the Board of Directors on a regular basis, but no less than annually, and in that regard shall make such recommendations to the Board of Directors with respect to risk assessment and risk management as the Committee may deem necessary or appropriate.

*    *    *

**Ongoing Matters**

- The Committee shall prepare the report required by the rules of the SEC regarding the Committee, to be included in the Company's annual proxy statement and, if applicable, any reports required to be filed with the Canadian securities regulatory authorities.  In furtherance thereof, the Committee will include a statement within such report on whether the Committee has recommended that the financial statements be included in the Form 10-K and ensure that a copy of the Committee's Charter is publicly available to the extent required in accordance with applicable SEC rules.

- The Committee shall review with the Company's counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

- The Committee shall periodically review, and make any appropriate recommendations to the Board of Directors concerning updates or changes to, the Company's Global Code of Business Conduct and Ethics (the "Code"), and ensure that management has established a system to enforce the Code.  The Committee shall also review the procedures established by the Company that monitor the compliance by the Company with the Code by directors, officers and employees, and compliance by the Company with its loan and indenture covenants and restrictions.  The Committee shall periodically review the effectiveness of the Company's corporate compliance program.

- The Committee shall periodically review the Related Party Transaction Policies and Procedures and review and approve any transactions between the Company and related parties in accordance with that policy.

- The Committee shall review legislative and regulatory developments affecting environmental, social and governance ("ESG") reporting, at least annually, including sustainability and climate-related disclosures within the financial reporting framework.  The Committee will oversee the reporting and auditing of any mandatory sustainability and climate-related disclosures that require information to be presented on a global consolidated basis.

- The Committee shall hold such meetings as may be necessary or appropriate with the Company's management and independent public accountants in separate sessions to discuss any matters that the Committee or each of these groups believe should be discussed privately. Such special meetings as may be called by the chairperson of the Committee or at the request of the Company's management or independent public accountants.

- To the extent it deems necessary or appropriate, the Committee may also meet with the Company's investment bankers and any other advisors to the company, as appropriate, to carry out its duties.

- The Committee shall consider such other matters in relation to the financial affairs of the Company and its accounts, and in relation to the audit of the Company, as the Committee may, in its discretion, determine to be advisable.

## <u>SUBSTANTIVE ALLEGATIONS</u>

63.     Lululemon is a premier athletic apparel retailer specializing in high-end performance wear, with a particular focus on yoga and fitness clothing. The Company has evolved from its initial emphasis on women's yoga apparel to offering a comprehensive range of activewear for both men and women. However, Lululemon's most lucrative market before and during the Relevant Period was U.S. women's products.

64.     The Company reports sales and revenue in three geographic segments: The Americas, China Mainland, and Rest of World. The Americas represent the majority of the Company's revenue, representing 79% of net revenue in fiscal year 2023, 94% of net revenue in fiscal year 2022, and 85% of net revenue in fiscal year 2021.

**The IDEA Program**

**A.     Racial Social Justice Initiatives**

65.     In response to decades of leadership underrepresentation, with women comprising only 23.3% of directors globally, corporations launched more focused efforts to elevate qualified women to board positions and senior management roles. Certain American public companies took action by adding female directors during the Relevant Period. Outside the U.S., nations including

Belgium, France, Germany, Norway, and the United Arab Emirates have mandated minimum female representation on corporate boards.

66.     While the Individual Defendants caused Lululemon to lag behind contemporary standards, other major corporations, particularly in the tech sector, moved decisively to condemn racism and implement social justice initiatives.  These actions responded to public outrage over the murders of, among many others, George Floyd, Breonna Taylor, and Ahmaud Arbery.  Major companies implemented substantial diversity initiatives: (1) Microsoft, Intel, and Johnson & Johnson linked executive pay to diversity metrics; (2) Google committed to increasing Black and underrepresented groups in senior positions by 30% by 2025; (3) Apple raised its hiring of women and historically underrepresented groups in tech from 21% in 2014 to 31% in 2018, pledging to "increase representation in leadership across the company[]"; (4) PepsiCo launched a five-year, $400 million initiative targeting 30% Black managerial representation and doubled business with Black-owned suppliers; (5) Adidas pledged 30% of new positions for Black or Latino workers; and (6) Reddit's cofounder Alexis Ohanian resigned from the all-White board, advocating for a Black replacement and committing future Reddit stock gains to serve the Black community, starting with Colin Kaepernick's Know Your Rights Camp.

67.     Goldman Sachs announced that the investment bank would refuse assistance to U.S. or European companies lacking diverse board membership after July 1, 2020.  Given research showing "significantly better" performance for companies with diverse boards, David Solomon, Goldman Sachs' CEO, stated that "I think [having a 'diverse' board] is the best advice for companies that want to drive premium returns for their shareholders over time."

68.     On January 7, 2021, *Bloomberg Law* reported that tech companies, including Facebook and Microsoft, supported Nasdaq's diversity plan, urging SEC approval to increase corporate board diversity.

69.     On December 31, 2023, Nasdaq implemented rules requiring listed companies to maintain diverse boards or explain their absence. *Reuters* reported that when first proposed, the Nasdaq operator said that "over two dozen studies found an association between diverse boards and better financial performance and corporate governance."

70.     The actions taken by Goldman Sachs and the Nasdaq underscore that board diversity and anti-discrimination compliance are essential elements for enhancing stockholder value, protecting investors, strengthening corporate decision-making processes, and ensuring effective oversight of management.

## B.     Lululemon Establishes the IDEA Program

71.     In October 2020, aligning with other companies' commitments to improve diversity representation, Lululemon launched a new "Impact Agenda" that included IDEA as one of its primary focus areas.

72.     IDEA's stated objective was to: "Reflect the diversity of the communities the Company serves and operates in around the world by 2025." However, throughout the Relevant Period, the Individual Defendants caused the Company to fail to disclose that IDEA was not structured so as to meaningfully combat discrimination within Lululemon and as a result, Lululemon employees experienced discriminatory treatment.

## C.     Materially False and/or Misleading
##         Statements Regarding the IDEA Program

73.     On October 28, 2020, Lululemon issued a press release announcing its "first-ever Impact Agenda detailing the Company's long-term strategy to become a more sustainable and

equitable business, minimize its environmental impact, and accelerate positive change both internally and externally." Press Release, Lululemon Athletica Inc., Lululemon Athletica Inc. Releases Impact Agenda, Unveiling its Social and Environmental Goals and Strategies to Create a Healthier Future (Oct. 28, 2020). This announcement introduced IDEA as part of the Impact Agenda.

74.    In a public message posted on the Company's website, Defendant McDonald explained the impetus for IDEA's creation: "In 2020, after many real and impactful conversations with our underrepresented employees and our greater community, we heard loud and clear that we needed to evolve behaviours both within our own walls and our collective." He further elaborated:

> IDEA – Inclusion, Diversity, Equity and Action – focuses on making systemic changes. By standing up and funding IDEA, and creating our commitments grounded in action and accountability, we are determined to be engaged and act in allyship.
>
> For us, IDEA is a critical business function that is embedded into everything we do. We are proud of the progress we are making, and we are a stronger company because of the culture we continue to build together.

75.    On October 30, 2020, the Company issued a press release announcing that it had hired Stacia Jones ("Jones") to serve as Vice President, Global Head of IDEA. Press Release, lululemon Athletica Inc., Lululemon Athletica Inc. Announces Leadership Appointments as Company Continues to Focus on Growth, Innovation, and Diversity & Inclusion (Oct. 30, 2020).

76.    On March 30, 2021, the Company filed its 2020 annual report on Form 10-K with the SEC. Lululemon Athletica Inc., Annual Report (Form 10-K) (Mar. 30, 2021) (the "2020 Form 10-K"). The 2020 Form 10-K was signed by Defendants Casey, Ferris, Frank, Gibson, Glynn, Henry, McDonald, McNeill, Morfitt, Murphy, Mussafer, and White. The 2020 Form 10-K stated as follows regarding IDEA:

> We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.

*      *      *

We are investing $5 million to fund to our global IDEA activities. These funds can further support the career progress of our diverse talent and increase access to internal opportunities and professional development. We offer all employees IDEA education, training, and guided conversations on a variety of topics, including antiracism, anti-discrimination, and inclusive leadership behaviors. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

77.     On March 29, 2022, the Company filed its 2021 annual report on Form 10-K with the SEC. Lululemon Athletica Inc., Annual Report (Form 10-K) (Mar. 29, 2022) (the "2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants Casey, Ferris, Frank, Gibson, Henry, Loehnis, McDonald, McNeill, Morfitt, Murphy, Mussafer, and White. The 2021 Form 10-K stated as follows regarding IDEA:

We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.

*      *      *

We expect to invest at least $5 million annually to fund our global IDEA activities. These funds can further support the career progress of our diverse talent and increase access to internal opportunities and professional development. We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

24

78.    On March 28, 2023, the Company filed its 2022 annual report on Form 10-K with the SEC.  Lululemon Athletic Inc., Annual Report (Form 10-K) (Mar. 28, 2023) (the "2022 Form 10-K").  The 2022 Form 10-K was signed by Defendants Casey, Frank, Gibson, Henry, Loehnis, Mahe, McDonald, McNeill, Morfitt, Murphy, Mussafer, and White.  The 2022 Form 10-K stated as follows regarding IDEA:

> We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.
>
> Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision.  The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.
>
> *       *       *
>
> We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors.  We have established People Networks, which are employee resource groups that represent employees who have marginalized and historically underrepresented identities.  We see significant engagement in IDEA education and training across our global employee base.  We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

79.    On March 21, 2024, the Company filed its 2023 annual report on Form 10-K with the SEC.  Lululemon Athletica Inc., Annual Report (Form 10-K) (Mar. 21, 2024) (the "2023 Form 10-K").  The 2023 Form 10-K was signed by Defendants Casey, Frank, Grant, Henry, List, Loehnis, Mahe, McDonald, McNeill, Morfitt, Mussafer, and White.  The 2023 Form 10-K stated as follows regarding IDEA:

> We believe IDEA is fundamental for shaping and building our company, industry, and communities, and for creating a shared sense of respect and belonging.  By continuously striving to be an inclusive, diverse, and equitable organization, we aim to reflect a variety of perspectives and meet the needs of the global communities we serve.

*     *     *

We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We have established People Networks, which are employee resource groups for employees who have marginalized and historically underrepresented identities. We see significant engagement in IDEA education and training across our global employee base. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

80.     The above statements were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors (i) that IDEA lacked the structural framework needed to effectively combat discrimination within Lululemon; and (ii) consequently, Lululemon employees continued to experience discriminatory treatment.

**D.     Lululemon's Board Suffers from a Lack of Diversity**

81.     While the Individual Defendants were publishing the aforementioned misleading statements regarding the IDEA program, the Company's Board demonstrated a notable lack of racial diversity, further highlighting the falsity of the above-referenced statements.

82.     Specifically, during the period when the Individual Defendants made false and misleading statements about the IDEA program, the Company's Board never exceeded two racially diverse members and maintained just one racially diverse member for the majority of the Relevant Period.

83.     Accordingly, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing Lululemon to make the materially false and misleading statements referenced above. In particular, these statements failed to disclose that Lululemon neither "continuously striv[ed] to be an inclusive, diverse, and equitable organization"

26

nor did it "encompass a culture of inclusion where diversity is celebrated, equity is the norm, and action is the commitment."

84.    Additionally, the statements failed to disclose that Lululemon had taken inadequate steps toward eliminating bias in its hiring and promotion process, evidenced by the fact that throughout the Relevant Period, the Board had zero Native American, Hispanic, or Pacific Islander directors, and currently has just one director from a minority background.  Consequently, the Company's public statements regarding diversity and the IDEA program were materially false and misleading throughout all relevant times.

**Inventory Allocation Issues**

**A.    The U.S. Women's Market Is Lululemon's Most Lucrative Market**

85.    Lululemon's largest market is the U.S., followed by Canada, Europe, and the Asia-Pacific region (especially China).  While the Company has worked to expand its international presence, the U.S. accounts for a significant portion of its revenue.

86.    Lululemon's most lucrative market before and during the Relevant Period was U.S. women's products.  According to the Company's Form 10-K for the fiscal year ended January 29, 2023, which was signed by Defendants Casey, Frank, Gibson, Henry, Loehnis, Mahe, McDonald, McNeill, Morfitt, Murphy, Mussafer, and White and filed on March 28, 2023, "our largest customer group is made up of guests who shop our women's range[.]"  Lululemon Athletica Inc., Annual Report (Form 10-K) (Mar. 28, 2023) (the "2022 Form 10-K").

87.    The 2022 Form 10-K also states that $5,654,343,000 of Lululemon's net revenue for fiscal year 2022, or approximately 70% of Lululemon's total net revenue for FY22, came from sales to customers in the U.S.  In addition, the 2022 Form 10-K states that $5,259,803,000 of Lululemon's net revenue for fiscal year 2022, or approximately 65% of Lululemon's total net revenue for fiscal year 2022, came from sales of U.S. women's products.

88.    Similarly, the 2023 Form 10-K stated that Lululemon's "operations in the Americas are core to our business and we aim to continue to grow our net revenue in this market through ongoing product innovation and by building brand awareness." The 2023 Form 10-K states that 367 of Lululemon's 711 Company-operated stores, approximately 52%, were located in the U.S. during fiscal year 2023. The 2023 Form 10-K also states that $6,346,392,000 of Lululemon's net revenue for fiscal year 2023, or approximately 66% of Lululemon's total net revenue for fiscal year 2023, came from sales to customers in the U.S. In addition, the 2023 Form 10-K states that $6,147,372,000 of Lululemon's net revenue for fiscal year 2023, or approximately 64% of Lululemon's total net revenue for fiscal year 2023, came from sales of women's products.

89.    On at least three separate occasions, Defendant McDonald reinforced the idea that U.S. women's products was Lululemon's key market, speaking directly to analysts and investors. For example, in a December 6, 2024 interview with *CNBC*, McDonald stated: "the opportunity for [Lululemon] is very specific. It's women's U.S." In addition, following his presentation at the 2025 National Retail Federation Retail's Big Show Conference[1] in New York City earlier that day, Defendant McDonald stated during an interview with CNBC on January 14, 2025, that "[Lululemon's] stock price is a reflection of, of the U.S. business."

**B.    Lululemon's Inventory Management Is Critical to Revenue Generation**

90.    To sustain and grow the Company's U.S. women's business during the Relevant Period, Lululemon had to ensure that its inventory allocation – *i.e.*, the sizes and colors of U.S. women's products that the Company intended to sell to customers – was sufficient to meet expected customer demand.

---

[1] The National Retail Federation Retail's Big Show is the world's leading annual retail event and the NRF is the world's largest retail trade association.

91.    If Lululemon purchases too much inventory relative to expected demand, then revenue and profit will be negatively impacted because the Company will be forced to sell the excess inventory at a discounted price, which compresses profit margins.    Conversely, if Lululemon purchases too little inventory relative to expected demand, then revenue and profit will be negatively impacted because the Company will miss out on sales opportunities by not having the correct inventory allocation.

92.    Effective inventory management was therefore critical to sustainable revenue and profit growth.  As Defendant Frank explained in 2023, "Our overall goal is to manage inventory in line with our revenue growth."  Moreover, in each of the Company's Forms 10-Q and 10-K, and investor conference calls discussing fiscal year 2022 and 2023 results, the Individual Defendants mentioned Lululemon's then-current inventory management efforts.

93.    By June 2022, Lululemon had deployed a purposeful strategy to be over-inventoried after experiencing supply chain disruptions in 2020 and 2021 caused by the COVID-19 global pandemic.  As Defendant Frank stated on the December 8, 2022 conference call announcing the Company's third quarter fiscal 2022 results, "in terms of inventory, we ended quarter 3 with dollar inventory up 85% on a 1-year basis . . . As we discussed, our inventory levels were too lean [in 2021], and we made the strategic decision to build inventories this year, which enabled the strong top line growth we have delivered."

94.    By January 2023, it was clear that the Company's rapid inventory growth in 2022 was putting revenue and profit at risk.  To combat this, Lululemon had to reduce its overall inventory to better match expected demand at the start of fiscal year 2023.

95.    In announcing the Company's full year financial results for fiscal year 2022 in March 2023, Defendant Frank stated that "[i]n 2023, our inventory growth will continue to

moderate, while we maintain our full price selling model, and we remain well positioned to fulfill guest demand."

96.    On March 29, 2023, Defendant McDonald stated in a *CNBC* interview that he was actively focused on managing Lululemon's inventory levels for the third and fourth quarters of 2023, specifically stating that "we've been beating our guidance on managing that inventory down without markdowns through full price sale . . . we've guided again in this quarter having inventory . . . in line with sales at the back half of the year."

97.    Among other statements, on the second quarter fiscal year 2023 earnings call, Defendant Frank stated, "in terms of how we're looking at inventory for the balance of the year, at the end of Q3, we're expecting high single to low double digits.  And then in Q4, end of Q4, relatively in line with sales as we move into 2024.  So I would say overall, we're really pleased with the currency and also the level of our inventory."

98.    As a result, analysts and investors watched the Company's inventory management closely and were misled into believing that by December 2023, Lululemon had succeeded in matching the Company's inventory allocation to expected demand.

**C.    Lululemon's Cloud-Based Inventory System
      Allows for Accurate Real-Time Inventory Visibility**

99.    In September 2022, Lululemon purchased and implemented the Nedap N.V. ("Nedap") iD Cloud inventory management system (the "Nedap System") throughout the Company's North American operations.  The Nedap System is a cloud-based software program for inventory management that utilizes radio frequency identification ("RFID") technology.  RFID technology allows a device to read inventory information contained in a wireless tag from a distance without physical contact or line of sight, giving the Individual Defendants the ability to view and manage the Company's inventory composition and quality in real-time.

100.    Nedap's website explains that the Nedap System allows customers like Lululemon to "[m]anage the entire supply chain with accurate stock information and automate product registration at warehouses and distribution centers." A key feature of the Nedap System is that it gives customers the "instant" ability to "trigger replenishment of missing sizes" from retail stores.

101.    The website further states that the Nedap System allows customers to "[e]asily monitor the average on-shelf availability of your inventory. The percentage of on-shelf availability gives an indication of whether the most relevant sizes of articles are available for customers on the sales floor." So Lululemon could "[v]iew [its] stock across the entire network of [its] supply chain and have items move between [its] stores, distribution centres and ecommerce without losing sight of any single item. Perfectly match demand and supply anywhere, at any time."

102.    On January 12, 2023, Nedap issued a press release titled "Lululemon partners with Nedap to advance RFID technology across stores globally" (the "Nedap PR") which stated that Lululemon selected the Nedap System in August 2022, and it provided "real-time item-level insights into their stock levels and the exact location of each item."

103.    The Nedap PR quoted Carl Baker ("Baker"), the Company's Vice President of Global Omni Programs, as stating that the Nedap System now allowed Lululemon to "leverage real-time, accurate data" and to possess "accurate real-time store inventory visibility."

104.    Moreover, on January 17, 2023 at the National Retail Federation Retail's Big Show, Baker participated in a panel discussion titled "No Future in Retail without RFID: How Lululemon uses RFID to create inventory visibility produced by Nedap" with, among others, Liam Kerney ("Kerney"), Lululemon's Vice President, Global Retail Engineering and Services (the "2023 NRF Panel Discussion").

31

105.    During the 2023 NRF Panel Discussion, Baker stated that adopting the Nedap System allowed Lululemon to have near-perfect inventory management capabilities, including the ability to assess the Company's inventory to instantaneously know whether a specific size and color for a U.S. product is available in any of Lululemon's stores or distribution centers.  Kerney stated that the Nedap System was "a mission critical system for [Lululemon]" and confirmed that all senior executives were involved in adopting the Nedap System, again highlighting the import of this development for the Company.

106.    According to the Nedap PR, the Nedap System was successfully deployed to Lululemon's North American stores by September 2022, and was available globally by January 2023.  This meant that by at least January 2023, Lululemon attached a small RFID chip to the tag on each inventory item warehoused in the Company's distribution centers and located in the Company's physical stores.

107.    So by at least January 2023, the Individual Defendants had the ability to know instantly: (1) if specific sizes and colors for U.S. women's products were being purchased at an increased level of frequency, *i.e.*, increased demand; (2) how much of these specific sizes and colors remained available in Lululemon's inventory to satisfy the increased level of demand for these U.S. women's products; and (3) that Lululemon's inventory lacked sufficient amounts of these specific sizes and colors of U.S. women's products to meet continued increased demand.

### D.    Lululemon's Back-to-School Marketing Campaign

108.    In the summer of 2023, Lululemon launched a back-to-school marketing campaign in the U.S. directed at younger, college-aged women and thus featured small-sized models and a variety of colors across Lululemon's U.S. women's product offerings.  The campaign included social media platforms and paid partnerships with "influencers," in addition to paid affiliate advertising, partnerships with large universities, and other forms of advertising.

109.    For example, during July and August 2023, Lululemon's official Instagram account frequently responded to comments on a July 21, 2023 Instagram post on Lululemon's official page that asked for the specific color names of the smaller sized U.S. women's products modeled in the video.  And influencer posts in July and August similarly featured smaller sized models and a variety of colors.

110.    In addition, affiliate posts on popular websites such as *E! News* advertised certain products as coming in seventeen to nineteen colors, and Lululemon's U.S. women's products were placed in high-profile college campuses to drive brand awareness among the college-aged demographic.

111.    The back-to-school marketing campaign was successful in that younger U.S. customers responded well to the campaign, which resulted in increased expected demand for the sizes and colors of U.S. women's products that were advertised.

112.    However, despite the success of this campaign, which led to an expected increased demand for sizes 0 to 4 and more variety of colors in U.S. women's products, Michelle (Sun) Choe ("Choe"), Lululemon's Chief Product Officer ("CPO"), who was responsible for determining the sizing and color purchases for Lululemon's inventory allocation and the related obligation to ensure that these purchases would be sufficient to meet expected future demand, failed to purchase enough sizes 0 to 4 and color of U.S. women's products for Lululemon's inventory allocation to meet the expected increased demand for those items that was facilitated by the 2023 back-to-school marketing campaign and related efforts to drive increased sales to younger U.S. women.

113.    As a result, Lululemon failed to ensure the correct allocation of colors and sizes in U.S. women's products for the fiscal year 2024, which Defendant McDonald admitted in October 2024 was the result of "decisions we made" versus any outside factors, such as competition.  In

December 2024, Defendant McDonald reiterated that the inventory allocation failure was caused by Choe, and the failure was the result of "decisions we made around the merchandising mix. And the data's pointing to that, and it has all year."

      **E.    The Breezethrough Leggings Launch**

      114.    As a result of the failure to ensure adequate inventory allocation described above, the Company's stock began experiencing a significant decline in 2024, despite strong fiscal year performance in 2023, when the Company set lower-than-expected revenue and earnings per share ("EPS") growth projections for the first quarter of 2024.

      115.    By mid-2024, Lululemon's stock had decreased approximately 34% year-to-date as of April, despite potential long-term growth in its international and men's segments, highlighting the import of U.S. women's products.

      116.    During the fourth quarter 2023 earnings call, Defendant McDonald introduced the idea that the launch of a new leggings product, the Breezethrough legging line, would begin to reverse the slowdown in the Company's U.S. market caused by the failure to ensure adequate sizes 0 to 4 and color in U.S. women's products to capture the increased demand from the 2023 back-to-school marketing campaign.

      117.    During the first quarter 2024 earnings call, the Individual Defendants told investors that the Beezethrough legging would be the first new product launch of 2024 and would represent "significant innovation" in Lululemon's U.S. business, based on the hydrogen yarn used in the product.

      118.    The Company launched its Breezethrough line on July 9, 2024, amid high expectations from both Lululemon, customers, analysts, and investors.

      119.    However, shortly after release, the new line faced strong customer backlash regarding fit and design issues; customers criticized the leggings' waistband and seam placement

as unflattering.  These issues compelled Lululemon to stop sales and pull the leggings from U.S. stores and online on July 24, 2024, just two weeks after they were launched in a supposed bid to reverse the slowdown in Lululemon's U.S. growth caused by the inventory allocation failure.

120.    That same day, *Bloomberg* released a report (the "July 2024 Bloomberg Report") in which a Lululemon spokesperson was quoted as saying, "[w]e have made the decision to pause on [Breezethrough legging] sales for now to make any adjustments necessary to deliver the best possible product experience."  Thus, the July 2024 Bloomberg Report informed investors that the Breezethrough legging was not in fact a new product launch intended to drive growth, but actually a "test and learn" for a new possible product line.

121.    On July 25, 2024, the Company's shares fell by $24.74 per share to $247.32, marking Lululemon's lowest stock price since May 2020, during the height of the COVID-19 pandemic.

**F.    False and Misleading Statements Regarding
the Company's Inventory Allocation Issues**

122.    Throughout the Relevant Period, the Individual Defendants made material misstatements and omitted material information regarding the status of Lululemon's then-current inventory allocation versus expected demand.

123.    On December 7, 2023, Lululemon issued a press release announcing the Company's net revenue "increased 19% to 2.2 billion" and income from operations "decreased 4% to $338.1 million."  Press Release, Lululemon Athletica Inc., Lululemon Athletica Inc. Announces Third Quarter Fiscal 2023 Results Board Of Directors Authorizes $1.0 Billion Stock Repurchase Program (Dec. 7, 2023) (the "December 7, 2023 Press Release").  The December 7, 2023 Press Release quoted Defendant McDonald as saying "[t]his was another strong quarter for

lululemon as our innovative product offerings and community activations continued to powerfully resonate with our guests globally."

124.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC. Lululemon Athletica Inc., Quarterly Report (Form 10-Q) (December 7, 2023) (the "Q3 2023 Form 10-Q").  Attached to the 3Q 2023 Form 10-Q were certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Frank and McDonald attesting to the accuracy of the financial reporting contained in the report.

125.    The 3Q 2023 Form 10-Q contained the following risk disclosure:

If we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

126.    Regarding Lululemon's inventory allocation, the 3Q 2023 Form 10-Q stated, in relevant part:

To ensure adequate inventory supply, we must forecast inventory needs and place orders with our manufacturers based on our estimates of future demand for particular products. Our ability to accurately forecast demand for our products could be affected by many factors, including an increase or decrease in guest demand for our products or for products of our competitors, our failure to accurately forecast guest acceptance of new products, product introductions by competitors, unanticipated changes in general market conditions (for example, because of global economic concerns such as inflation, an economic downturn, or delays and disruptions resulting from local and international shipping delays and labor shortages), and weakening of economic conditions or consumer confidence in future economic conditions (for example, because of inflationary pressures, or because of sanctions, restrictions, and other responses related to geopolitical events). If we fail to accurately forecast guest demand, we may experience excess inventory levels or a shortage of products available for sale in our stores or for delivery to guests.

Inventory levels in excess of guest demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margin to suffer and could impair the strength and exclusivity of our brand. Conversely, if we underestimate guest demand for our products, our manufacturers may not be able to deliver products to meet our requirements, and this could result in damage to our reputation and guest relationships.

127.    On the related earnings call, Defendant Frank stated, "[w]e remain comfortable with both the quality and quantity of our inventory."  He also stated that, "we feel pleased with the level and currency of the inventory, both at the end of Q3 and then at the end of Q4 as well."

128.    During the same earnings call, Defendant McDonald stated, in pertinent part, that "[t]he quarter began strong as guests responded well to our back-to-school product innovations and our strategies to connect with younger guests through dedicated digital marketing and targeted activations and our market share gains continued."  Defendant McDonald further stated, "[w]e have not seen a dramatic shift as it relates to our product and our assortment . . . [we're] not seeing a behavioral shift within our assortment mix with our guests."

129.    The statements above in ¶¶ 123-28 were materially false and misleading when made because Lululemon had experienced a behavioral shift in the Company's assortment mix as a result of the 2023 back-to-school advertising campaign and lacked sufficient quantities of sizes 0 to 4 or color for U.S. women's products to capture the increased demand from younger U.S. customers.  In addition, instead of accurately describing the present risks to Lululemon posed by the Company's failure to ensure the correct inventory allocation of U.S. women's products, the risk disclosures were false and misleading because risks they described as hypothetical had already materialized.

130.    On January 8, 2024, Lululemon issued a press release raising its revenue and earnings projections for the fourth fiscal quarter of 2023, ending on January 28, 2024.  Press Release, Lululemon Athletica Inc., Lululemon Athletica Inc. Updates Revenue and Earnings Expectations for the Fourth Quarter Ahead of the ICR Conference (Jan. 8, 2024) (the "January 8, 2024 Press Release").  The January 8, 2024 Press Release stated, in relevant part:

> Meghan Frank, Chief Financial Officer, commented: "We are pleased with our
> performance during the holiday season, as guests continue to respond well to our

innovative and versatile product offerings. Our sales trend remains balanced across channels, categories, and geographies, enabling us to raise our guidance for the fourth quarter and close out another strong year."

131.    This statement was false and misleading because by this time, Lululemon's inventory was already depleted without replenishment due to Lululemon's inventory allocation failure in August 2023, meaning that there were not enough "product offerings" to meet Lululemon's expected demand for U.S. women's products.

132.    On March 21, 2024, during the fourth quarter 2023 earnings call, Defendant McDonald stated, in pertinent part:

> As we obviously mentioned that we're chasing color and size. And we expect that, that will continue to improve starting in Q2 through [Q4]. In fact, we're seeing -- and as color hits now, the guests respond incredibly well to it.

133.    Also on March 21, 2024, Lululemon filed the 2023 Form 10-K, which stated, in pertinent part:

> To ensure adequate inventory supply, we must forecast inventory needs and place orders with our manufacturers based on our estimates of future demand for particular products. Our ability to accurately forecast demand for our products could be affected by many factors, including an increase or decrease in guest demand for our products or for products of our competitors, our failure to accurately forecast guest acceptance of new products, product introductions by competitors, unanticipated changes in general market conditions (for example, because of global economic concerns such as inflation, an economic downturn, or delays and disruptions resulting from local and international shipping delays and labor shortages), and weakening of economic conditions or consumer confidence in future economic conditions (for example, because of inflationary pressures, or because of sanctions, restrictions, and other responses related to geopolitical events). If we fail to accurately forecast guest demand, we may experience excess inventory levels or a shortage of products available for sale in our stores or for delivery to guests.
>
> Inventory levels in excess of guest demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margin to suffer and could impair the strength and exclusivity of our brand. Conversely, if we underestimate guest demand for our products, our manufacturers may not be able to deliver products to meet our requirements, and this could result in damage to our reputation and guest relationships.

134.    The above statements in ¶¶ 132-33 were materially false and misleading when made because Lululemon's depleted inventory of sizes 0 to 4 and color varieties in U.S. women's products could not quickly improve because of Choe's failure to purchase enough of this inventory in August 2023.  In addition, instead of accurately describing the present risks to Lululemon posed by the Company's failure to ensure the correct inventory allocation of U.S. women's products, the risk disclosures were false and misleading because the risks they described as hypothetical had already materialized.

### G.    False and Misleading Statements Regarding the Breezethrough Leggings

135.    On the March 21, 2024 earnings call, Defendant McDonald stated with regard to the Breezethrough leggings, "[w]e have a hydrogen yarn legging coming out in summer for yoga . . . that we see playing a positive through the back half of this year."

136.    The 2023 Form 10-K also stated that "[i]f we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability."

137.    These statements were false and misleading when made because the Breezethrough leggings suffered from obvious design flaws and was never intended to be a new product launch in 2024, meaning these leggings had no chance of reversing the U.S. growth slowdown in 2024 caused by Lululemon's inventory allocation failure in U.S. women's products.  In addition, because the Breezethrough legging had obvious design flaws that made it unappealing to consumers, Lululemon had failed to anticipate customer preferences, and thus the risk described as hypothetical had already materialized.

138.    On June 5, 2024, Lululemon issued a press release announcing that the Company's revenue "increased 10% to $2.2 billion" and income from operations "increased 8% to $432.6 million."  Press release, Lululemon Athletica Inc., Lululemon Athletica Inc. Announces First

Quarter Fiscal 2024 Results (June 5, 2024) (the "June 5, 2024 Press Release").  The June 5, 2024

Press Release further stated, in relevant part:

> Guests responded well to our product innovations across categories, and we are
> pleased by the progress we are making to optimize our U.S. product assortment.
> Looking ahead, we continue to have a significant runway for growth and are
> confident in our team's ability to powerfully deliver for our guests in 2024 and
> beyond.

139.    That same day, Lululemon filed a quarterly report on Form 10-Q with the SEC.

Lululemon Athletica Inc., Quarterly Report (Form 10-Q) (June 5, 2024) ("Q1 2024 Form 10-Q").

Appended to the Q1 2024 Form 10-Q were SOX certifications signed by Defendants Frank and

McDonald attesting to the accuracy of the financial reporting contained in the report.  The Q1 2024

Form 10-Q contained the following risk disclosure:

> If we are unable to anticipate consumer preferences and successfully develop and
> introduce new, innovative, and differentiated products, we may not be able to
> maintain or increase our sales and profitability.

140.    On the June 5, 2024 earnings call, Defendant McDonald stated, in relevant part:

> Looking forward, we're on track to bring significant innovation into our
> assortments beginning the end of Q2 and into the second half of the year. Within
> women's, we have some exciting new launches planned within our leggings
> assortment. These include a new innovation design for hot, low impact workouts
> and made from a new performance fabric, one of our quickest drying and lightest
> weight to date . . . The upcoming newness in leggings is a perfect example of how
> we continue to bring innovation into our core categories, where we already have
> significant strength. Our teams continue to expand our product offerings with new
> technical solutions, and I'm excited for you to see these new styles.
>
> *        *        *
>
> We have some exciting new innovation coming in our leggings, in particular in the
> next few weeks. Early July, we'll be launching a new innovation in leggings with
> a hydrogen yar[n] called [Breezethrough].

141.    The statements referenced in ¶¶ 138-40 were materially false and misleading

because they created a materially false impression that the Breezethrough legging was intended to

be a new launch of a key U.S. women's product, when in reality the product suffered from obvious

design flaws and was never intended to be a new product launch in 2024 and therefore was inherently incapable of reversing the U.S. growth slowdown caused by the inventory allocation failure in U.S. women's products.

**Investors Learn The Truth**

  **A.**  **The Truth Regarding the IDEA Program Is Revealed**

  142. On November 20, 2023, BoF published the BoF Article denouncing Lululemon's discriminatory practices.  The BoF Article interviewed fourteen current and former Lululemon employees.  These employees alleged that IDEA failed to achieve its stated objectives.  Some even suggested that these programs actually contributed to discriminatory treatment of employees at Lululemon.  According to the BoF Article, the accounts of these former employees:

> [D]escribe a corporate culture that is unwelcoming of Black people and leaders regularly use stereotypes to define and ostracise minority employees, who face barriers to career advancement that don't seem to apply to white colleagues. Staffers who drew the company's attention to these issues told BoF they were passed over for promotions, reprimanded, and, in several cases, had their employment terminated.

  143. According to the BoF Article, management shut down a Lululemon store in the Chicago area after its general manager had built a team that included several Black employees.  In the aftermath of this closure, approximately one-third of the store's staff (six out of sixteen former employees) submitted formal complaints to the U.S. Equal Employment Opportunity Commission alleging racial discrimination.

  144. The BoF Article revealed an instance where a former Black employee was put on a performance improvement plan in June 2022.  According to BoF, the employee believed this action was taken because he did not change his communication style to match that of his white coworkers in emails and other written correspondence.  In response, he filed an internal complaint suggesting racial discrimination was a factor.  The BoF Article states that Lululemon told him a

third-party investigation found his discrimination claims to be unsubstantiated.  BoF reviewed the employee's termination letter which stated as follows:

> Lululemon wrote to [the former employee] that his "belief that Lululemon has a discriminatory culture," and his potential to share those views with job candidates rendered him unable to promote the company as "a positive place to work," which is "critical" to his role as a recruiter.

145.    The BoF Article further revealed that there were significant concerns about conflicts of interest in how Lululemon handled discrimination complaints internally.  The BoF Article revealed that the IDEA department was involved in investigating and responding to racism complaints, based on information from three former employees who had direct insight into IDEA operations.  The situation became more complicated in May 2023 when Jones took on a dual role— she continued leading IDEA while also becoming head of employee relations, policy, and compliance.  While Lululemon maintained that discrimination complaints were handled by employee relations, the article raised ethical questions about having the same person in charge of both investigating discrimination claims and leading the Company's anti-discrimination initiatives.

146.    BoF characterized Lululemon's IDEA program as a flawed diversity, equity, and inclusion initiative.  Multiple former employees, including two who had worked directly within the IDEA department, expressed doubts to BoF about Jones's capability to deliver the significant organizational changes that the IDEA department had committed to making.  The BoF Article concluded by explaining the following fundamental flaw with IDEA:

> [T]he risk in having DEI sit inside HR—as Lululemon's IDEA department is designed—is that it can be difficult to distinguish between who should be handling what . . .  When a diversity chief like Jones reports to the head of that department rather than a CEO, there's a significant risk that diversity is left out of the company's "grand strategy," which is mostly designed by members of the C-Suite—not the HR department.

147.    Following the BoF Article's publication, on January 5, 2024, *Yahoo! Finance* published an article titled "lululemon Accused of Performative DEI Practices With a Former Employee Claiming A Supervisor Told Her, 'We Just Need to Ride this Wave.'"

148.    On this news, Lululemon's share price declined by $4.90, approximately 1%, from a closing price of $496.00 on January 4, 2024, to close at $491.10 on January 5, 2024.

### B.    The Truth Regarding the Company's Inventory Allocation Issues Emerges

149.    On March 21, 2024, Lululemon issued a press release announcing its fourth quarter and full year 2023 financial results.  In the March 21, 2024 Press Release, the Company revealed that net revenue in The Americas grew by only 9% during the fourth quarter and 12% for fiscal year 2023, significantly lower than the 29% growth from the previous year and 12% growth in the prior quarter.

150.    During the related earnings call discussing the announced financial results, Defendant McDonald stated:

> As I mentioned, our sizing in particular in zero to four is something we're chasing into.  Color, where we had color, it performed well.  And honestly, we just did not have enough.  And both of these attributes over-index in the U.S., which is where I see the opportunity.  And we're going to continue to play offense in the market. The innovation product pipeline remains very strong for this year and we have some exciting brand initiatives in addition.
>
> Where that's showing up?  We're seeing a slowdown in traffic in the U.S., but it's still positive and conversion is down slightly.  And I link that to some of the product opportunities we have in the sizing and color, which as I said, we will – we are chasing until we will get stronger through the quarters.

151.    On this news, Lululemon's stock price fell more than 15%, dropping from a closing price of $478.84 per share on March 21, 2024, to close at $403.19 per share on March 22, 2024.

152.    On May 21, 2024, Lululemon announced in a Form 8-K that Choe had departed the Company on May 15, 2024, that the CPO position was not being replaced, and that Lululemon was implementing a more integrated organizational structure.

153.    On this news, the Company's stock price fell $23.35 per share, or approximately 7.2%, from a close of $322.98 per share before the announcement on May 21, 2024, to close at $299.63 per share on May 22, 2024.

154.    On July 24, 2024, *Bloomberg* analysts reported that Lululemon's new Breezethrough leggings launch was "raising concern[s]," noting that the launch had suffered from "inconsistent" inventory allocation and pricing, with "certain locations carr[ying] Breezethrough leggings while others didn't carry the new line," suggesting "ongoing allocation-related issues."

155.    On July 25, 2024, before the market opened, *Bloomberg* published an article titled "lululemon Slides as New Product Sales Pause Spooks Analysts."  This article reported that a Lululemon spokesperson told the agency that the Company "made the decision to pause on sales [of the Breezethrough product] for now to make any adjustments necessary to deliver the best possible product experience."  The article continued stating as follows:

> The decision prompted JPMorgan to remove Lululemon from its list of top stock picks.  The Breezethrough product line halt removes a key revenue driver for the retailer in the back half of the year, analysts led by Matthew Boss, said in a note on Thursday.
>
> "Breezethrough compounds recent in-stock/color palette execution concerns, pushing out the reacceleration catalyst likely to 4Q/Holiday with our recent fieldwork pointing to no signs of near-term improvement through 2Q," said Boss, who has an overweight rating on the stock.
>
> Meanwhile, Citigroup downgraded its rating on Lululemon shares to neutral from buy, saying its credit card data suggests active apparel trends further decelerated in the second quarter.
>
> Analysts have raised several concerns on Breezethrough, including product allocation to stores, pricing, fit and comfort levels.  Its launch is just the latest in a

string of ongoing challenges at Lululemon.  Most recently, Lululemon's legging business was hurt by the lack of color newness, and unavailability of certain sizes.

On the company's June conference call, CEO Calvin McDonald stated that revenue growth would accelerate in the second half of the year, helped by "upcoming product launches and innovation."

However, Citi's Paul Lejuez warned that trends in the active apparel category are not in Lululemon's favor.  After three years of strong growth, the group has "slowed meaningfully" in 2024 and he sees "no signs" that it will improve later this year.

"This dynamic, coupled with Lululemon's execution issues (lackluster product assortment/lack of color/sizing), leave Lulu more susceptible to increased competition and promotional pressures," he wrote in a note.

On this news, the Company's share price fell $24.74, or 9.09%, to close at $247.32 per share on July 25, 2024, on unusually heavy trading volume.

## THE COMPANY ISSUES FALSE AND MISLEADING PROXY STATEMENTS

156.    On April 27, 2021, Lululemon filed a Schedule 14A with the SEC.  Lululemon Athletica Inc., Proxy Statement (Form DEF 14A) (Apr. 27, 2021) (the "2021 Proxy Statement"). Defendants Casey, Ferris, Gibson, Glynn Henry, McDonald, McNeill, Murphy, Morfitt, and Mussafer solicited proxies to vote at the annual stockholder meeting via the 2021 Proxy Statement. The 2021 Proxy Statement contained material misstatements and omissions.

157.    The 2021 Proxy Statement asked Lululemon stockholders to vote to, among other things, (1) reelect Defendants McDonald, Morfitt, and White to the Board for a three-year term ending as of the Company's annual meeting of stockholders in 2024 and to reelect Defendant Gibson for a two-year term ending as of the Company's annual meeting of stockholders in 2023; (2) ratify the appointment of PricewaterhouseCoopers LLP ("PwC") as Lululemon's independent registered public accounting firm for the fiscal year ending January 30, 2022; and (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Frank and McDonald, commonly referred to as "say-on-pay."

158.    The 2021 Proxy Statement included these statements about IDEA:

**Inclusion, Diversity, Equity and Action (IDEA)** The Black Lives Matter movement acted as a powerful catalyst within our organization in fiscal 2020.  After many real and impactful conversations with our underrepresented employees and our greater community, we heard that we need to evolve within our own walls to support meaningful, lasting change in the world.  We added "Inclusion" as one of our core values, and established IDEA Advisory and Steering Committees, led by our chief executive officer.  We hired our global head of IDEA and built a team to work to meet our commitments.  We invested $5 million in 2020, and plan to continue investing in 2021 to fund our global IDEA activities.  These funds can further support the career progress of our diverse talent and increase access to internal opportunities and professional development.

*       *       *

*Inclusion, Diversity, Equity, and Action (IDEA)*

We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision.  The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.  We are proud that as of January 31, 2021, approximately 55% of our board of directors, 65% of our senior executive leadership team, and 50% of all vice presidents and above are women, while approximately 75% of our overall workforce are women.

We maintain 100% gender pay equity within our entire global employee population, meaning equal pay for equal work across genders.  We have achieved pay equity across all areas of diversity in the United States and are seeking, to the extent permitted under local law and regulation, to collect the data necessary to confirm complete pay equity globally.

We offer all employees IDEA education, training, support, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors, in a variety of forums.  We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

159.    While invoking the Black Lives Matter movement and promoting the IDEA program, the 2021 Proxy Statement's discussion of diversity focused exclusively on gender representation, remaining silent on the matter of racial diversity.

160.    The Company filed its 2022 Proxy Statement on Schedule 14A with the SEC on April 27, 2022, solicited by Defendants Casey, Ferris, Gibson, Henry, Loehnis, McDonald, McNeill, Morfitt, Murphy, Mussafer, and White.  Lululemon Athletica Inc., Proxy Statement (Form DEF 14A) (Apr. 27, 2022) (the "2022 Proxy Statement").  The 2022 Proxy Statement contained material misstatements and omissions.

161.    The 2022 Proxy Statement asked Lululemon stockholders to vote to, among other things, (1) reelect Defendants Henry and McNeill and elect Defendant Loehnis to the Board for a three-year term ending as of the Company's annual meeting of stockholders in 2025; (2) ratify the appointment of PwC as Lululemon's independent registered public accounting firm for the fiscal year ending January 29, 2023; and (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, including Frank and McDonald, commonly referred to as "say-on-pay."

162.    The 2022 Proxy Statement contained the following regarding IDEA:

IDEA (Inclusion, Diversity, Equity, and Action): Our IDEA mission is to expand being well to encompass a culture of inclusion where diversity is celebrated, equity is the norm, and action is the commitment.  In 2021, lululemon made strides in our IDEA journey, building what we believe is an ecosystem of inclusion that resulted in increased representation, a healthier culture, application of inclusive design principles, and the implementation of IDEA in everything we do.

163.    At the time these statements were made in 2022, the Company's Board had achieved only 9% racial diversity, as acknowledged in the 2022 Proxy Statement.

164.    The Company filed its 2023 Proxy Statement on Schedule 14A with the SEC on April 27, 2023, solicited by Defendants Casey, Gibson, Henry, Loehnis, Mahe, McDonald,

McNeill, Morfitt, Murphy, Mussafer, and White. Lululemon Athletica Inc., Proxy Statement (Form DEF 14A) (Apr. 27, 2023) (the "2023 Proxy Statement"). The 2023 Proxy Statement contained material misstatements and omissions.

165. The 2023 Proxy Statement asked Lululemon stockholders to vote to, among other things, to (1) reelect Defendants Casey, Murphy, Mussafer to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2026; and reelect Defendant Mahe to the Board for a one-year term ending as of the Company's annual meeting of stockholders in fiscal year 2024; (2) ratify the appointment of PwC as Lululemon's independent registered public accounting firm for the fiscal year ending January 28, 2024; (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Frank and McDonald, commonly referred to as "say-on-pay"; (4) approve, in a non-binding advisory vote, the frequency of say-on-pay votes for the compensation of the Company's named executive officers, including Defendants Frank and McDonald; and (5) approve the adoption of the 2023 Equity Incentive Plan.

166. The 2023 Proxy Statement contained the following regarding IDEA:

IDEA (Inclusion, Diversity, Equity, and Action): Our IDEA mission is to expand being well to encompass a culture of inclusion where diversity is celebrated, equity is the norm, and action is the commitment. In 2022, lululemon continued to make significant strides in our IDEA journey, building an ecosystem of inclusion that resulted in increased representation, a healthier culture, application of inclusive design principles, and the implementation of IDEA in everything we do.

167. At the time these statements were made in 2023, only two members of the Company's eleven-person Board were racially diverse, as disclosed in the 2023 Proxy Statement.

168. On April 25, 2024, the Company filed its 2024 Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Casey, Gibson, Henry, Loehnis, Mahe, McDonald, McNeill, Morfitt, Murphy, Mussafer, and White. Lululemon Athletica Inc., Proxy Statement (Form DEF

14A) (Apr. 25, 2024) (the "2024 Proxy Statement").  The 2024 Proxy Statement contained material

misstatements and omissions.

169.    The 2024 Proxy Statement asked Lululemon stockholders to vote to, among other

things, (1) reelect Defendants McDonald, Mahe, Morfitt, and White to the Board for a three-year

term ending as of the Company's annual meeting of stockholders in fiscal year 2027 and to reelect

Defendants Grant, and List to the Board for a two-year term ending as of the Company's annual

meeting of stockholders in fiscal year 2026; (2) ratify the appointment of PwC as Lululemon's

independent registered public accounting firm for the fiscal year ending February 2, 2025 and (3)

approve, in a non-binding advisory vote, the compensation of the Company's named executive

officers, including Frank and McDonald, commonly referred to as "say-on-pay."

170.    Despite the truth emerging in November 2023, the 2024 Proxy Statement contained

the following regarding the IDEA program:

> IDEA (Inclusion, Diversity, Equity, and Action): Our IDEA mission is to expand
> being well to encompass a culture of inclusion where diversity is celebrated, equity
> is the norm, and action is the commitment.  In 2023, lululemon made significant
> strides in our IDEA journey, including increasing diversity within our retail stores.
> We successfully rolled out our Women Of Leadership cohort and continued to drive
> IDEA learning through toolkits and our allyship initiative, LEAN (Learning in
> Equity, Actioning Now).  We also advanced more than 200 people through our
> Inclusion and Equitable Design Certification program, the biggest cohort to date.

171.    At the time these statements were made in 2024 (after the truth emerged, thus with

knowledge or a reckless disregard of the falsity of the statements), the racial diversity on the

Company's Board, as admitted in the 2024 Proxy Statement, consisted of just one member out of

the eleven-person Board.

172.    Regarding "Risk Oversight," the 2024 Proxy Statement provided the following, in

relevant part:

> In its governance role, and particularly in exercising its duty of care and diligence,
> our board of directors is responsible for overseeing and assessing risk management

policies and procedures designed to protect the company's assets and business. While our board of directors has the ultimate oversight responsibility for the risk management process, our board of directors has delegated to the audit committee the initial responsibility of overseeing the company's risk assessment and risk management.  In fulfilling its delegated responsibility, the audit committee has directed management to ensure that an approach to risk management is implemented as a part of the day-to-day operations of lululemon, and to design internal control systems with a view to identifying and managing material risks.

On a periodic basis, the audit committee reviews and discusses with the appropriate members of our finance team and our internal auditors the company's significant financial risk exposures and the steps that management has taken to monitor, control, and report those risks. In addition, the audit committee regularly evaluates the company's policies, procedures, and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security, and data protection), including discussions with management about material risk exposures and the steps being taken to monitor, control, and report those risks.  The audit committee reports its activities to the full board of directors on a regular basis and in that regard makes such recommendations to our board of directors with respect to risk assessment and management as it may deem necessary or appropriate.

*      *      *

On a periodic basis, the people, culture and compensation committee reviews the various design elements of our compensation policies and practices to determine whether any of their aspects encourage excessive or inappropriate risk-taking by our executive officers.  The people, culture and compensation committee reports its activities in this regard to the full board of directors and makes such recommendations to our board of directors with respect to our compensation policies and practices as it may deem necessary or appropriate.

The board oversees environmental, social and governance management of the company and has delegated responsibility to both the audit committee and the corporate responsibility, sustainability and governance committee.  The board and its committees assess whether management has appropriate mechanisms to oversee the development of ESG initiatives, strategies, policies and practices related to matters of sustainability and corporate responsibility that may have material impact on the company.  As part of this function, the board and its committees review and discuss reports submitted by management with respect to the company's current goals and metrics, as well as significant events, issues and risks that may affect the company's business or financial performance.

173.    The foregoing statements in the 2024 Proxy Statement (including those referenced

*supra* with respect to the IDEA program) contained materially false and misleading statements

and/or failed to disclose, *inter alia*, that Lululemon was experiencing issues with its inventory allocation and color palette execution.  Consequently, the Director Defendants did not effectively "oversee[] and assess[] risk management policies and procedures designed to protect the Company's assets and business."  Nevertheless, on June 6, 2024, Company stockholders voted to approve the proposals set forth in the 2024 Proxy Statement.  Had the stockholders known the truth, including the facts about the IDEA program, they would not have approved the proposals solicited in the 2024 Proxy Statement.

174.    The 2021, 2022, 2023, and 2024 Proxy Statements (collectively, the "Proxy Statements") were materially misleading because they failed to disclose that: (i) although Lululemon claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated the Code of Conduct; (ii) contrary to the Proxy Statements' descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Lululemon to issue false and misleading statements; (iii) Individual Defendants allowed the Insider Trading Defendants to sell stock at artificially inflated prices while in possession of material non-public information; and (iv) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements.

175.    The Proxy Statements were also materially misleading because they failed to disclose to investors, *inter alia*, that: (i) IDEA was not effectively structured to combat discrimination within Lululemon; (ii) as a result, Lululemon employees continued to face discriminatory treatment; and (iii) by failing to ensure IDEA was properly structured to combat discrimination effectively, the Individual Defendants violated the Code of Conduct; and (iv) as a

result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading and lacked a reasonable basis.

### THE INSIDER TRADING DEFENDANTS SELL COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

176.    During the period of wrongdoing described above, Lululemon insiders sold Company stock at artificially inflated prices while in possession of material non-public Company information.

177.    The Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- Between February 16, 2021 and April 1, 2024, Defendant Frank sold 10,712 shares for proceeds of approximately $3,881,205.

- Between June 7, 2021 and September 12, 2022, Defendant Henry sold 1,434 shares for proceeds of approximately $539,336.

- Between March 29, 2021 and April 1, 2024, Defendant McDonald sold 115,389 shares for proceeds of approximately $44,058,730.

178.    While many of the Company's stockholders lost significant money when the Company's shares dropped substantially upon the revelation of the fraud, the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by stockholders.

179.    As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Lululemon stock and stock options they held.

## INVESTORS LEARN THE TRUTH

### A.      The Truth Regarding the IDEA Program Is Revealed

180.    On November 20, 2023, BoF published the BoF Article denouncing Lululemon's discriminatory practices.  The BoF Article interviewed fourteen current and former Lululemon employees.  These employees alleged that IDEA failed to achieve its stated objectives.  Some even suggested that these programs actually contributed to discriminatory treatment of employees at Lululemon.  According to the BoF Article, the accounts of these former employees:

> [D]escribe a corporate culture that is unwelcoming of Black people and leaders regularly use stereotypes to define and ostracise minority employees, who face barriers to career advancement that don't seem to apply to white colleagues. Staffers who drew the company's attention to these issues told BoF they were passed over for promotions, reprimanded, and, in several cases, had their employment terminated.

181.    According to the BoF Article, management shut down a Lululemon store in the Chicago area after its general manager had built a team that included several Black employees.  In the aftermath of this closure, approximately one-third of the store's staff (six out of 16 former employees) submitted formal complaints to the U.S. Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination.

182.    The BoF Article revealed an instance where a former Black employee was put on a performance improvement plan in June 2022.  According to BoF, the employee believed this action was taken because he did not change his communication style to match that of his white coworkers in emails and other written correspondence.  In response, he filed an internal complaint suggesting racial discrimination was a factor.  The BoF Article states that Lululemon told him a third-party investigation found his discrimination claims to be unsubstantiated.  BoF reviewed the employee's termination letter which stated as follows:

> Lululemon wrote to [the former employee] that his "belief that Lululemon has a discriminatory culture," and his potential to share those views with job candidates

rendered him unable to promote the company as "a positive place to work," which is "critical" to his role as a recruiter.

183.    The BoF Article further revealed that there were significant concerns about conflicts of interest in how Lululemon handled discrimination complaints internally.  The BoF Article revealed that the IDEA department was involved in investigating and responding to racism complaints, based on information from three former employees who had direct insight into IDEA operations.  The situation became more complicated in May 2023 when Jones took on a dual role— she continued leading IDEA while also becoming head of employee relations, policy, and compliance.  While Lululemon maintained that discrimination complaints were handled by employee relations, the article raised ethical questions about having the same person in charge of both investigating discrimination claims and leading the Company's anti-discrimination initiatives.

184.    BoF characterized Lululemon's IDEA program as a flawed diversity, equity, and inclusion initiative.  Multiple former employees, including two who had worked directly within the IDEA department, expressed doubts to BoF about Jones's capability to deliver the significant organizational changes that the IDEA department had committed to making.  The BoF Article concluded by explaining the following fundamental flaw with IDEA:

> [T]he risk in having DEI sit inside HR—as Lululemon's IDEA department is designed—is that it can be difficult to distinguish between who should be handling what . . .  When a diversity chief like Jones reports to the head of that department rather than a CEO, there's a significant risk that diversity is left out of the company's "grand strategy," which is mostly designed by members of the C-Suite—not the HR department.

185.    Following the BoF Article's publication, on January 5, 2024, *Yahoo! Finance* published an article titled "lululemon Accused of Performative DEI Practices With a Former Employee Claiming A Supervisor Told Her, 'We Just Need to Ride this Wave.'"

186.    On this news, Lululemon's share price declined by $4.90, approximately 1%, from a closing price of $496.00 on January 4, 2024, to close at $491.10 on January 5, 2024.

## B.    The Truth Regarding the Company's Inventory Allocation Issues Emerges

187.    On March 21, 2024, Lululemon issued a press release announcing its fourth quarter and full year 2023 financial results.  In the March 21, 2024 Press Release, the Company revealed that net revenue in the Americas grew by only 9% during the fourth quarter and 12% for fiscal year 2023, significantly lower than the 29% growth from the previous year and 12% growth in the prior quarter.

188.    During the related earnings call discussing the announced financial results, Defendant McDonald stated as follows:

> As I mentioned, our sizing in particular in zero to four is something we're chasing into.  Color, where we had color, it performed well.  And honestly, we just did not have enough.  And both of these attributes over-index in the U.S., which is where I see the opportunity.  And we're going to continue to play offense in the market. The innovation product pipeline remains very strong for this year and we have some exciting brand initiatives in addition.

> Where that's showing up?  We're seeing a slowdown in traffic in the U.S., but it's still positive and conversion is down slightly.  And I link that to some of the product opportunities we have in the sizing and color, which as I said, we will – we are chasing until we will get stronger through the quarters.

189.    On this news, Lululemon's stock price fell more than 15%, dropping from a closing price of $478.84 per share on March 21, 2024, to close at $403.19 per share on March 22, 2024.

190.    On May 21, 2024, Lululemon announced in a Form 8K that Choe had departed the Company on May 15, 2024, that the CPO position was not being replaced, and that Lululemon was implementing a more integrated organizational structure.

191.    On this news, the Company's stock price fell $23.35 per share, or approximately 7.2%, from a close of $322.98 per share before the announcement on May 21, 2024, to close at $299.63 per share on May 22, 2024.

192.    The July 2024 Bloomberg Report revealed that Lululemon's new Breezethrough leggings launch was "raising concern[s]," noting that the launch had suffered from "inconsistent inventory allocation and pricing, with "certain locations carr[ying] Breezethrough leggings while others didn't carry the new line," suggesting "ongoing allocation-related issues."

193.    On July 25, 2024, before the market opened, *Bloomberg* published an article titled "lululemon Slides as New Product Sales Pause Spooks Analysts."  This article reported that a Lululemon spokesperson told the agency that the Company "made the decision to pause on sales [of the Breezethrough product] for now to make any adjustments necessary to deliver the best possible product experience."  The article continued:

> The decision prompted JPMorgan to remove Lululemon from its list of top stock picks.  The Breezethrough product line halt removes a key revenue driver for the retailer in the back half of the year, analysts led by Matthew Boss, said in a note on Thursday.
>
> "Breezethrough compounds recent in-stock/color palette execution concerns, pushing out the reacceleration catalyst likely to 4Q/Holiday with our recent fieldwork pointing to no signs of near-term improvement through 2Q," said Boss, who has an overweight rating on the stock.
>
> Meanwhile, Citigroup downgraded its rating on Lululemon shares to neutral from buy, saying its credit card data suggests active apparel trends further decelerated in the second quarter.
>
> Analysts have raised several concerns on Breezethrough, including product allocation to stores, pricing, fit and comfort levels.  Its launch is just the latest in a string of ongoing challenges at Lululemon.  Most recently, Lululemon's legging business was hurt by the lack of color newness, and unavailability of certain sizes.
>
> On the company's June conference call, CEO Calvin McDonald stated that revenue growth would accelerate in the second half of the year, helped by "upcoming product launches and innovation."

However, Citi's Paul Lejuez warned that trends in the active apparel category are not in Lululemon's favor. After three years of strong growth, the group has "slowed meaningfully" in 2024 and he sees "no signs" that it will improve later this year.

"This dynamic, coupled with Lululemon's execution issues (lackluster product assortment/lack of color/sizing), leave Lulu more susceptible to increased competition and promotional pressures," he wrote in a note.

194.    On this news, the Company's share price fell $24.74, or 9.09%, to close at $247.32 per share on July 25, 2024, on unusually heavy trading volume.

## AN INVESTOR FILES A SECURITIES CLASS ACTION

195.    On August 8, 2024, a purported purchaser of Company stock filed the Securities Class Action complaint, captioned *Patel v. Lululemon Atheletica Inc., et al.*, Case No. 1:24-cv-06033 in the United States District Court for the Southern District of New York against Lululemon and Defendants Frank and McDonald. The Securities Class Action alleges that throughout the class period of December 7, 2023 to July 24, 2024, defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Securities Class Action alleges that Defendants failed to disclose to investors that (1) the Company was struggling with inventory allocation issues and color palette execution issues; (2) the Company's Breezethrough leggings introduction was not a product launch and so could not have remedied the U.S. growth issue caused by the inventory allocation failure; (3) as a result of the foregoing, defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Lead plaintiffs filed an amended complaint on March 10, 2025.

## LULULEMON REPURCHASES SHARES DURING THE RELEVANT PERIOD

196.    During the Relevant Period, the Individual Defendants caused the Company to repurchase its common stock at artificially inflated prices. In total, during the Relevant Period, the Company spent approximately $2,703,778,063 to repurchase 7,711,667 shares at artificially

inflated prices.  The actual value of the Company's stock was $247.32 per share, as of closing on

July 25, 2024, therefore, Lululemon should have spent approximately $1,907,249,482 to

repurchase its stock during the Relevant Period.  As a result of the overpayment, Lululemon

suffered damages in the amount of approximately $796,528,581.

197.    The following chart details the Company's repurchase transactions during the

Relevant Period:

| Time Period | Number of Shares Purchased | Avg Price Paid per Share | Total Paid | Share Value as of 7/25/2024 | What Company Should Have Paid | Overpayment |
|---|---|---|---|---|---|---|
| 04/05/2021 - 05/02/2021 | 269,517 | 311.02 | 83,825,177.34 | 247.32 | 66,656,944.44 | 17,168,232.90 |
| 05/03/2021 - 05/30/2021 | 126,219 | 319.68 | 40,349,689.92 | 247.32 | 31,216,483.08 | 9,133,206.84 |
| 05/31/2021 - 07/04/2021 | 309,725 | 377.80 | 117,014,105.00 | 247.32 | 76,601,187.00 | 40,412,918.00 |
| 07/05/2021 - 08/01/2021 | 69,573 | 375.15 | 26,100,310.95 | 247.32 | 17,206,794.36 | 8,893,516.59 |
| 08/02/2021 - 08/29/2021 | 42,034 | 403.83 | 16,974,590.22 | 247.32 | 10,395,848.88 | 6,578,741.34 |
| 08/30/2021 - 10/03/2021 | 208,854 | 416.12 | 86,908,326.48 | 247.32 | 51,653,771.28 | 35,254,555.20 |
| 10/04/2021 - 10/31/2021 | 331,591 | 399.68 | 132,530,290.88 | 247.32 | 82,009,086.12 | 50,521,204.76 |
| 11/01/2021 - 11/28/2021 | 38,385 | 463.93 | 17,807,953.05 | 247.32 | 9,493,378.20 | 8,314,574.85 |
| 11/29/2021 - 01/02/2022 | 477,777 | 399.62 | 190,929,244.74 | 247.32 | 118,163,807.64 | 72,765,437.10 |
| 01/03/2022 - 01/30/2022 | 327,428 | 343.62 | 112,510,809.36 | 247.32 | 80,979,492.96 | 31,531,316.40 |
| 01/31/2022 - 02/27/2022 | 364,581 | 323.27 | 117,858,099.87 | 247.32 | 90,168,172.92 | 27,689,926.95 |

| Time Period | Number of Shares Purchased | Avg Price Paid per Share | Total Paid | Share Value as of 7/25/2024 | What Company Should Have Paid | Overpayment |
|---|---|---|---|---|---|---|
| 02/28/2022 - 04/03/2022 | 223,501 | 311.34 | 69,584,801.34 | 247.32 | 55,276,267.32 | 14,308,534.02 |
| 04/04/2022 - 05/01/2022 | 120,288 | 375.67 | 45,188,592.96 | 247.32 | 29,749,628.16 | 15,438,964.80 |
| 05/02/2022 - 05/29/2022 | 291,967 | 300.98 | 87,876,227.66 | 247.32 | 72,209,278.44 | 15,666,949.22 |
| 05/30/2022 - 07/03/2022 | 119,672 | 292.1 | 34,956,191.20 | 247.32 | 29,597,279.04 | 5,358,912.16 |
| 07/04/2022 - 07/31/2022 | 8,401 | 297.54 | 2,499,633.54 | 247.32 | 2,077,735.32 | 421,898.22 |
| 08/01/2022 - 08/28/2022 | 31,504 | 317.15 | 9,991,493.60 | 247.32 | 7,791,569.28 | 2,199,924.32 |
| 08/29/2022 - 10/02/2022 | 23,092 | 303.09 | 6,998,954.28 | 247.32 | 5,711,113.44 | 1,287,840.84 |
| 11/28/2022 - 01/01/2023 | 101,551 | 333.22 | 33,838,824.22 | 247.32 | 25,115,593.32 | 8,723,230.90 |
| 01/02/2023 - 01/29/2023 | 110,980 | 313.92 | 34,838,841.60 | 247.32 | 27,447,573.60 | 7,391,268.00 |
| 01/30/2023 - 02/26/2023 | 83,681 | 313.46 | 26,230,646.26 | 247.32 | 20,695,984.92 | 5,534,661.34 |
| 02/27/2023 - 04/02/2023 | 75,404 | 303.82 | 22,909,243.28 | 247.32 | 18,648,917.28 | 4,260,326.00 |
| 04/03/2023 - 04/30/2023 | 132,626 | 369.32 | 48,981,434.32 | 247.32 | 32,801,062.32 | 16,180,372.00 |
| 05/01/2023 - 05/28/2023 | 150,902 | 374.39 | 56,496,199.78 | 247.32 | 37,321,082.64 | 19,175,117.14 |
| 05/29/2023 - 07/02/2023 | 188,310 | 361.23 | 68,023,221.30 | 247.32 | 46,572,829.20 | 21,450,392.10 |
| 07/03/2023 - 07/30/2023 | 177,615 | 378.45 | 67,218,396.75 | 247.32 | 43,927,741.80 | 23,290,654.95 |
| 07/31/2023 - 08/27/2023 | 187,708 | 380.24 | 71,374,089.92 | 247.32 | 46,423,942.56 | 24,950,147.36 |

| Time Period | Number of Shares Purchased | Avg Price Paid per Share | Total Paid | Share Value as of 7/25/2024 | What Company Should Have Paid | Overpayment |
|---|---|---|---|---|---|---|
| 08/28/2023 - 10/01/2023 | 203,197 | 383.5 | 77,926,049.50 | 247.32 | 50,254,682.04 | 27,671,367.46 |
| 10/02/2023 - 10/29/2023 | 162,446 | 378.34 | 61,459,819.64 | 247.32 | 40,176,144.72 | 21,283,674.92 |
| 10/30/2023 - 11/26/2023 | 50,619 | 400.1 | 20,252,661.90 | 247.32 | 12,519,091.08 | 7,733,570.82 |
| 11/27/2023 - 12/31/2023 | 10,040 | 507.57 | 5,096,002.80 | 247.32 | 2,483,092.80 | 2,612,910.00 |
| 01/01/2024 - 01/28/2024 | 59,180 | 483.73 | 28,627,141.40 | 247.32 | 14,636,397.60 | 13,990,743.80 |
| 01/29/2024 - 02/25/2024 | 116,858 | 459.59 | 53,706,768.22 | 247.32 | 28,901,320.56 | 24,805,447.66 |
| 02/26/2024 - 03/31/2024 | 186,147 | 441.25 | 82,137,363.75 | 247.32 | 46,037,876.04 | 36,099,487.71 |
| 04/01/2024 - 04/28/2024 | 448,222 | 359.42 | 161,099,951.24 | 247.32 | 110,854,265.04 | 50,245,686.20 |
| 04/29/2024 - 05/06/2024 | 478,784 | 346.34 | 165,822,050.56 | 247.32 | 118,412,858.88 | 47,409,191.68 |
| 05/27/2024 - 06/30/2024 | 658,706 | 309.04 | 203,566,502.24 | 247.32 | 162,911,167.92 | 40,655,334.32 |
| 07/01/2024 - 07/28/2024 | 744,582 | 287.77 | 214,268,362.14 | 247.32 | 184,150,020.24 | 30,118,341.90 |
| Total | 7,711,667 | | 2,703,778,063.21 | | 1,907,249,482.44 | 796,528,580.77 |

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT
## DIRECTLY AND PROXIMATELY CAUSED DAMAGES TO LULULEMON

198.    As a result of the Individual Defendants' improprieties, Lululemon disseminated improper public statements concerning Lululemon's operations, prospects, and internal controls. This misconduct has devastated Lululemon's credibility.

60

199.     As a direct and proximate result of the Individual Defendants' actions, Lululemon has expended and will continue to expend significant sums of money defending and paying any settlement in the Securities Class Action.

200.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Lululemon's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

201.     Lastly, the actions of the Individual Defendants have irreparably damaged Lululemon's corporate image and goodwill.  For at least the foreseeable future, Lululemon will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Lululemon's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

202.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

203.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

204.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross

negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

205.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

206.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Lululemon and was at all times acting within the course and scope of such agency.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

207.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

208.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

209.    Plaintiff is an owner of Lululemon common stock and has been an owner of Lululemon common stock since the wrongdoing alleged herein.

210.    Plaintiff has hired counsel experienced in conducting derivative litigation and will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**Demand Is Futile**

### A.    Each Member of the Board Faces a Substantial Likelihood of Personal Liability

211.    At the time Plaintiff commenced this action, the Board consisted of the eleven Director Defendants: Casey, Grant, Henry, List, Loehnis, Mahe, McDonald, McNeill, Morfitt, Mussafer, and White.  The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

212.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Lululemon's business, operations, prospects, internal controls, and financial statements.

213.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

214.    The Director Defendants also approved the Proxy Statements and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

215.    The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

216.    If the Director Defendants were to bring a suit on behalf of Lululemon to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  For this reason, Plaintiffs' making a demand would be futile.

**B.    The Audit Committee Defendants Face an
        Even Greater Likelihood of Personal Liability**

217.    The Audit Committee Defendants (Defendants Casey, Grant, Henry, List, Loehnis, and Morfitt), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false statements.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy.  Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial reporting process and its systems of internal controls, as required by the Audit Committee Charter.  For this reason,

the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

**C.     The Insider Trading Defendants
        Face an Even Greater Likelihood of Personal Liability**

218.    Because of their positions as officers and/or board members, each of the Insider Trading Defendants (Defendants Frank, Henry, and McDonald) possessed material non-public information regarding (i) the continued discrimination despite the implementation of IDEA program; and (ii) the issues with the Company's inventory allocation.

219.    These Insider Trading Defendants unlawfully misused this information and unjustly enriched themselves by selling their shares at artificially inflated prices.  As a result, the Insider Trading Defendants' conduct harmed Lululemon as the Insider Trading Defendants unjustly enriched themselves at the Company's expense.  Accordingly, because this action asserts claims for unjust enrichment against the Insider Trading Defendants, and because the Insider Trading Defendants face a substantial likelihood of liability for these claims as well as for their breaches of fiduciary duty to the Company, the Insider Trading Defendants on the Board are incapable of considering a demand to commence and vigorously prosecute this action.

**D.     Defendant McDonald Lacks Independence**

220.    Defendant McDonald is not an independent director because his principal occupation is CEO of Lululemon.  Indeed, the 2024 Proxy Statement does not name McDonald as an independent director.

221.    In addition, Defendant McDonald is a named defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act as well as SEC Rule 10b-5 promulgated under the Exchange Act.  If the Company is found liable in the Securities Class Action for these violations of the federal

securities laws, the Company's liability will be in whole or in part due to Defendant McDonald's willful and/or reckless violations of his obligations as CEO and director of Lululemon. Hence, Defendant McDonald is incapable of considering a demand to commence and vigorously prosecute this action because he faces an even greater likelihood of personal liability than the rest of the Individual Defendants.

### E.    Defendants Morfitt, Mussafer, and White Lack Independence

222.    Defendants Morfitt, Mussafer, and White are not independent because of their significant business ties. Morfitt, Mussafer, and White have served as members of the board of directors of Olaplex Holdings, Inc. ("Olaplex") since August 2021. Prior to this role, Defendants Morfitt, Mussafer, and White served in Olaplex's pre-initial public offering reorganization, as members of the Board of Managers of Penelope Group GP since April 2021, January 2020, and since January 2020, respectively, until around August 2021.

### FIRST CAUSE OF ACTION
### Against the Individual Defendants for Breach of Fiduciary Duties

223.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

224.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lululemon's business and affairs.

225.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

226.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Lululemon.

227.    In breach of their fiduciary duties owed and owe to Lululemon, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, (i) the continued discrimination despite the implementation of IDEA program; (ii) the issues with the Company's inventory allocation; and (iii) that, as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

228.    Accordingly, Lululemon's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

229.    The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

230.    The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

231.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

232.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

233.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

234.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lululemon has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Individual Defendants for**
**Violations of Section 20(a) of the Exchange Act**

235.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

236.    The Individual Defendants, by virtue of their positions with Lululemon and their specific acts, were, at the time of the wrongdoing alleged herein, controlling persons of Lululemon and the officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants had the power to

influence, and exercised same, to cause Lululemon to engage in the illegal schemes and practices complaint of herein.

237.    The Individual Defendants did the following while acting individually and collectively:

        a.    employed devises, schemes, and artifices to defraud;

        b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of Lululemon common stock during the Relevant Period.

238.    As set forth above, the Individual Defendants disseminated or approved the dissemination of materially false and misleading statements while also failing to disclose material facts necessary to make the statements made not misleading under the circumstances.

239.    The Individual Defendants knew or recklessly disregarded facts showing that these statements were false and misleading because they received or had access to such information.

240.    As a result of the Individual Defendants' making these materially false and misleading statements or permitting them to be made, Lululemon's common stock traded at artificially inflated prices during the Relevant Period.

241.    As discussed above, the Company spent $2,703,778,063.21 purchasing 7,711,667 shares of Lululemon common stock at artificially inflated prices during the Relevant Period when it should have spent around $1,907,249,482.44 for that number of shares.

242.    Accordingly, the Company has suffered damages because it paid artificially inflated prices for Lululemon common stock.

### THIRD CAUSE OF ACTION
### Against the Individual Defendants for
### Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9

243.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

244.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

245.    The Proxy Statements violated Section 14(a) and Rule 14a-9 because they solicited Lululemon stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with its (i) the continued discrimination despite the implementation of the IDEA program; and (ii) the issues with the Company's inventory allocation.

246.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9.  By virtue of their positions within the Company and roles in the process and in the preparation of the Proxy Statements, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy Statements.

247.    The Individual Defendants knew that the statements contained in the Proxy Statements were materially false and misleading.

248.    The omissions and false and misleading statements in the Proxy Statements are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors.  Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statements and in other information reasonably available to stockholders.

249.    As a direct and proximate result of the dissemination of the false and misleading Proxy Statements that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, Nominal Defendant Lululemon suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### <u>Against the Individual Defendants for Unjust Enrichment</u>

250.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

251.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lululemon.

252.    The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Lululemon that was tied to the performance or artificially inflated valuation of Lululemon, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

253.    Plaintiff, as a stockholder and representative of Lululemon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or

valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

254.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Against All the Individual Defendants for Aiding and Abetting

255.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

256.    Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to Lululemon and has participated in a conspiracy in breach of fiduciary duties.

257.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

258.    The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

259. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

260. Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

261. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

### SIXTH CAUSE OF ACTION
### Against the Insider Trading Defendants for
### Insider Selling and Misappropriation of Information

262. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

263. At the time of their stock sales set forth herein, the Insider Trading Defendants (Frank, Henry, and McDonald) knew of the information described above and sold Lululemon common stock on the basis of such information.

264. The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Lululemon common stock.

265. The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

266.     Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Lululemon and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of Lululemon stock while in possession of insider information as described herein;

D.     Awarding prejudgment interest to the Company;

E.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  April 3, 2025                              Respectfully submitted,

                                                  **BRAGAR EAGEL & SQUIRE, P.C.**

                                                  */s/ J. Brandon Walker*
                                                  J. Brandon Walker
                                                  Melissa A. Fortunato
                                                  810 Seventh Avenue, Suite 620
                                                  New York, New York 10019
                                                  Phone: (212) 308-5858
                                                  Fax: (212) 486-0462
                                                  Email:  walker@bespc.com
                                                          fortunato@bespc.com

**VERIFICATION**

I, Arlin Wasserman, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of Lululemon Athletica, Inc., and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true.  I further declare that I am a current holder of Lululemon Athletica, Inc. stock and have continuously held Lululemon Athletica, Inc. stock from the time of the wrongdoing alleged herein until the present.  I declare under penalty of perjury that the foregoing is true and correct.

Executed this _2_ day of April 2025.

*Arlin Wasserman*
Arlin Wasserman (Apr 2, 2025 14:39 EDT)
_____
Arlin Wasserman